Argued and submitted January 3, reversed in part; otherwise affirmed
April 30, both petitions for review denied September 23, 1997 (326 Or 58)

STATE OF OREGON,
*Respondent,*

*v.*

JACK LEE HARELSON,
*Appellant.*

(95CR-0620; CA A91774)

938 P2d 763

Mark Hendershott argued the cause and filed the brief for appellant.

Kaye Ellen Sunderland, Assistant Attorney General, argued the cause for respondent. With her on the brief were

Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Defendant appeals his convictions of one count of theft in the first degree, ORS 164.055, two counts of abuse of a corpse, ORS 166.085, and two counts of tampering with physical evidence, ORS 162.295, all arising from his looting of Native American archeological sites in Nevada during the 1980's, and of one count each of possession of a gray machine, ORS 167.164, and possession of a slot machine, ORS 167.147, arising from devices found during a search of his house for Native American artifacts that he took during the looting. We reverse the convictions for abuse of a corpse on statute of limitations grounds and otherwise affirm.

Defendant is a long-time collector of Native American artifacts who has searched for and found them in many locations on public, Native American, and private land. In 1980, he discovered a location in Nevada that came to be known as Elephant Mountain Cave. The cave, which is on federal land, appears to have been a human habitation at several different times over a period of at least 5,000 years and possibly much longer. When defendant discovered it, the cave was a small slit in the side of the mountain. He and his then wife, who is now Pamela Ralph, dug for artifacts at the cave a number of times between 1980 and 1985, generally working in the winter and traveling at night in order to avoid detection. By the time they were finished, the cave was a cavern 70 feet wide and 12 feet high. They found many artifacts during their years of digging and took them home, in the process destroying the archeological context for those artifacts and almost all of the scientific value of the site.

During their digging, defendant and Ralph discovered two large baskets; one contained the body of a boy, and the other contained the body of a girl. They removed the bodies and associated artifacts from the baskets, kept the artifacts and the baskets for defendant's collection, placed the bodies in plastic garbage bags, and buried them in defendant's back yard. According to Ralph, the bodies were intact when buried; however, the heads were missing when they were disinterred a decade later as part of the investigation of defendant's activities. A witness testified that in April 1992

defendant had a human skull the size of a child in his house; defendant's comments at the time linked it to the bodies from the Elephant Mountain cave.

At some point, the authorities began investigating defendant's activities.[1] Ralph agreed, in exchange for immunity from prosecution, to assist in the investigation. The climax of the investigation came in April 1995, when the state police obtained a warrant to search defendant's property. Shortly before they did so, Ralph passed along a tip from an unidentified child that defendant had two gambling machines in his house. The police did not think that that tip provided probable cause to believe that defendant was committing any crime concerning those machines, but an officer with expertise in gambling crimes agreed to participate in the search. During the search, the police saw, in plain view in a room that also contained objects described in the search warrant, two apparent gambling machines. After obtaining defendant's consent to examine the machines, they determined that the slot machine was illegal and that the other machine was an illegal gray machine. *See* ORS 167.111(7).

Defendant was cooperative during the search. When the officers were unable to find many of the Elephant Mountain artifacts at his home, he told them that he had taken them to another location in order to hide them from the police. He then voluntarily took an officer to that location. On April 14, 1995, shortly after the search, he was indicted for the crimes for which he was ultimately convicted.[2]

In his first two assignments of error, defendant challenges the trial court's denial of his motions to dismiss and for a directed verdict on the counts for theft and abuse of a corpse. He argues that the prosecution of those offenses was not commenced until after the three year statute of limitations provided in ORS 131.125(5)(a) had expired. We first discuss the theft charge.

---

[1] Defendant was aware of the investigation, in part from comments that those who were assisting in it made to him.

[2] Plaintiff was tried on a superseding indictment, charging the same offenses, that the state obtained on December 19, 1995. The first count of each indictment charged defendant with aggravated first-degree theft. The court reduced the charge to first-degree theft before submitting the case to the jury.

Count 1 of the indictment alleged that defendant

"on or about January, 1993 and April, 1995, in Josephine County, Oregon, did unlawfully and knowingly commit theft of Native American Indian Artifacts and human remains, of the total value of $10,000 or more, the property of the Government of the United States, Paiute Indian Tribe, and other unnamed victims."

The evidence is that defendant took the property in question in Nevada, not Oregon, and that he did so no later than 1985. If the state were limited to proving theft by taking, ORS 164.015(1), defendant's argument might well be correct. The state argues, however, that defendant continued to commit theft by receiving, ORS 164.095, until April 1995, when the police took the stolen property from him. ORS 164.095(1) provides:

"A person commits theft by receiving if the person receives, *retains, conceals* or disposes of property of another knowing or having good reason to know that the property was the subject of theft." (Emphasis supplied.)

The state relies on defendant's retention or concealment of the stolen property within the statutory period to support the theft conviction.

Defendant emphasizes that he was convicted of theft by *receiving* and relies on the traditional rule that a person who commits theft by taking cannot also commit theft of the same property by receiving. *See State v. Carlton*, 233 Or 296, 297, 378 P2d 557 (1963). Because his theft of the artifacts by taking was complete when he took them, the limitations period expired long before the commencement of this prosecution, and he cannot now be prosecuted for receiving the very artifacts that he took. Defendant does not dispute that, under the statute, theft by receiving based on retaining or concealing stolen property can otherwise be a continuing offense, nor does he dispute that the evidence would support a finding that he did one or both of these things.

We have not decided whether the *Carlton* rule that an original thief cannot also be guilty of theft by receiving the same property continues to apply under the current criminal code. In *State v. Dechand*, 13 Or App 530, 511 P2d 430 (1973),

we relied on *Carlton* to hold, under the criminal code, that the defendant could not be convicted of burglary based on the theft of certain property on one day and also of theft by receiving the same property on a later day. 13 Or App at 539. However, in *State v. Bishop*, 16 Or App 310, 316 n 5, 518 P2d 177 (1974), we stated that, despite our reference to the *Carlton* rule in *Dechand*, it was "an open question whether this rule continues to accurately state the law in light of the consolidation of stolen-property offenses in the new criminal code."

We have also discussed the circumstances in which theft in general can be a continuing offense. In *State v. Watts*, 60 Or App 217, 653 P2d 560 (1982), *rev den* 294 Or 536 (1983), we held that theft by taking is not a continuing crime and, thus, that a person who may have committed theft by receiving the property that the defendant originally stole was not an accomplice to the original theft by taking. In *State v. Knutson*, 81 Or App 353, 725 P2d 407 (1986), we held that theft by receiving *is* a continuing crime when a person who receives stolen property from another conceals it. That is consistent with the Supreme Court's holding in *Carlton* that the original thief can be convicted of *concealing* property that he or she stole, even if the thief could not be convicted of *receiving* it. 233 Or at 297-98.

The answer to this question comes from the words of the statute, not from previous cases. The problem, in fact, is more apparent than real. It arises only because the legislature chose to adopt a theft by receiving statute that expanded the common-law concept of receiving stolen property to include retaining, concealing, or disposing of stolen property, things that can be done by the original thief as easily as by a subsequent receiver. In essence, the legislature gave the label of "theft by receiving" to a number of actions that do not fit either the common understanding or the statutory definition of "receiving." The *Carlton* rule may well continue to apply to one who receives stolen property within the statutory definition of "acquiring possession, control or title, or lending on the security of the property." ORS 164.095(2). That kind of theft by receiving may not be consistent with taking the property and is probably complete upon the acquisition of possession, control, or title, or the making of a loan.

What matters for this case, however, is that statutory "theft by receiving" now includes actions that *go far beyond* simply receiving stolen property. The reason for the *Carlton* rule has nothing to do with those additional actions, and the Supreme Court has not applied it to them. It is clear that retaining and concealing can well be continuing crimes, as we noted concerning concealing in *Knutson*. Courts in other jurisdictions, applying similar statutes, have held that a person who retains stolen property that the person originally stole may be convicted of theft by receiving. For example, in *Commonwealth v. Farrar*, 271 Pa Super 434, 413 A2d 1094 (1979), the defendant stole furniture in Maryland. She subsequently took it with her when she moved from Maryland to Pennsylvania. The court held that those actions constituted a crime under a statute that defined theft to include a person who "receives, retains, or disposes of" stolen property. The prohibition against retaining or disposing of the stolen property made the crime a continuing offense and took it outside the rule that a thief by taking cannot be a thief by receiving. Pennsylvania, therefore, had jurisdiction over the offense and the statute of limitations did not begin to run until the property was seized. For similar reasons, the trial court in this case correctly rejected defendant's defense of the statute of limitations on the theft charges.

■   The charges of abuse of a corpse present a different situation. ORS 166.085(1) provides that a person commits that offense if the person either (a) abuses a corpse or (b) disinters, removes, or carries away a corpse. ORS 166.085(3) provides that abusing a corpse "includes treatment of a corpse by any person in a manner not recognized by generally accepted standards of the community * * *." The indictment alleged that defendant unlawfully and intentionally abused the bodies "on or about January, 1993 and April, 1995[.]" There is no evidence that defendant took any action in relation to the bodies during that period.[3] Rather, they remained buried and undisturbed in defendant's garden.

---

[3] The evidence concerning defendant's possession of a skull that may have come from one of the bodies dates from 1992, before the period alleged in the indictment.

The state argues that defendant abused the bodies when he disinterred them, removed them from their burial baskets, and reburied them in a manner that violated generally accepted community standards. We agree that the jury could find that those actions constituted abuse of a corpse. The state then argues that defendant's abuse of the bodies continued as long as they remained improperly buried. It says,

> "a person has a continuing duty to treat dead bodies according to generally accepted community standards. To the extent he or she intentionally continues to interfere with proper treatment of a corpse, including its proper burial, he [or she] commits a new crime each day that the interference continues."

In support, the state relies on *State v. Rose*, 75 Or App 379, 383, 706 P2d 583 (1985), in which we held that custodial interference is a continuing offense, because the custodian's rights are violated each day the child is kept from the custodian.

The state fails to recognize that the statute defines abuse of a corpse as the performance of specific actions at specific times. Disinterring, removing, or carrying away a corpse are all discrete events that are completed once they have occurred. Treating a corpse in a manner not recognized by community standards can also be a discrete act that occurs at a specific moment. In this case, once the bodies were buried, defendant was no longer treating them in any way; his actions were completed.

In contrast, a person who commits custodial interference retains control of the child every day that the interference continues and thus continually commits the crime, just as a person who retains stolen property continually commits the crime of theft. There can be situations in which abuse of a corpse is also a continuing crime. For instance, if there were evidence that defendant had kept a skull in his house during the period alleged in the indictment, the jury could have found that he was continuing to treat a corpse in a manner not recognized by generally accepted community standards. However, in the absence of such evidence, abuse of a corpse terminates when the defendant's actions terminate. For that

reason, the statute of limitations forecloses prosecution of these counts. We therefore reverse defendant's convictions of abuse of a corpse.

Defendant's remaining four assignments of error do not require extended discussion. The supposed "other crimes" evidence was directly relevant to theft as alleged in the indictment. The trial court correctly sustained the state's hearsay objection to evidence of defendant's out-of-court statement explaining his purpose in possessing the gambling machines. Because the police received defendant's consent to examine the machines before they did so, there was no illegal search. Finally, the condition of probation that defendant is not to possess any Native American artifacts without proper written documentation is patently within the court's authority under ORS 137.540(2).

Convictions for abuse of corpse reversed; otherwise affirmed.